Ernest T. SMITH, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 79S00–9609–CR–583.

Supreme Court of Indiana.

Nov. 19, 1998.

Steven Knecht, Vonderheide & Knecht, Lafayette, Bruce W. Graham, Trueblood & Graham, Lafayette, for Appellant.

Jeffrey A. Modisett, Attorney General, Randi F. Elfenbaum, Deputy Attorney General, Indianapolis, for Appellee.

SELBY, Justice.

Defendant Ernest Smith ("defendant") was sentenced, after a jury trial, for murder and robbery while armed with a deadly weapon, a class B felony. In this appeal, defendant raises five issues: 1) whether the trial court erred in admitting DNA evidence; 2) whether the trial court erred in admitting evidence obtained in violation of a court order; 3) whether the trial court erred in admitting into evidence a deposition from an unavailable witness; 4) whether the State's comments during closing argument warrant a reversal; and 5) whether the State presented insufficient evidence to convict defendant of murder and robbery while armed with a deadly weapon. We answer each issue in the negative and affirm the trial court.

## FACTS

At approximately 2:00 p.m. on the afternoon of April 7, 1995, defendant was in a tavern named Mom's Place in Lafayette, Indiana. Defendant had been in Mom's Place before and knew, as he told a one-time cell-mate, that the owner, Barbara "Mom" Nobile, would be alone in the tavern at that time, that she often did not pay attention while she was in the tavern, and that she kept money in a cigar box at the bar. Defendant told his previous cell-mate that Nobile "would be easy to knock off." (R. at 3882.)

J.C. Dallas Long and his son David arrived at Mom's at approximately 2:00 that afternoon. They saw both Nobile and defendant in the bar. When the Longs left sometime between 2:30 and 3:00 p.m., defendant was still in Mom's Place. Around 3:15 or 3:20, Richard Barrett walked into Mom's Place. After a few minutes, during which time he did not see Nobile, Barrett became suspicious and looked around. He found Nobile in the utility room of the building. Her throat was slit and she had bled to death through a wound to her jugular vein. Nobile had also been stabbed on her palms, arms, chest, and back. Several hundred dollars was missing from the bar.

At some point during the afternoon of April 7, defendant's girlfriend saw him near her home. She observed what appeared to be blood on his pants leg between his knee and ankle. He told her that he had fallen and cut himself. Defendant was also seen later on April 7 at several bars where he spent money freely, though he had needed to borrow money the previous night. He also stayed in a hotel room that night, though he had stayed on a cousin's porch the night before.

The police arrested defendant on April 9, 1995. When photographed by police on April 12, defendant had no marks on his legs but did have scratch marks on his hands and neck. Defendant, while in jail, told his cell-mate that he and another man were drinking in Mom's Place on April 7 and that they talked of robbing and killing Nobile. Defendant also told his cell-mate that he must have blacked out and, when he awoke, he was covered in so much blood that he figured Nobile's throat had probably been cut. Defendant further confided that, if the police found his hunting knife, then he "figured he would be screwed." (R. at 3891.) Finally, defendant admitted that he had gotten blood on his pants and went to see his girlfriend.

At trial, the State introduced DNA evidence based upon two pieces of evidence: a towel found near the rear entrance to Mom's and the shoes that defendant was wearing when arrested. Testing determined that blood was on the towel and on defendant's right tennis shoe. The State then conducted DNA testing on the towel and the shoe. The results indicated that Nobile's DNA profile was consistent with that found in the blood on the shoe. The results also indicated that defendant's DNA profile was consistent with that found in the blood on the towel.

## DISCUSSION

### I.

Defendant argues that the trial court erred by allowing the State to present the DNA evidence in this case. At trial, defendant filed a motion to suppress the DNA evidence. The court held a lengthy and thorough suppression hearing. The motion was denied. This was reversible error, defendant argues, because several of the DNA tests conducted were scientifically unreliable, and thus inadmissible under Indiana Evidence

Rule 702. The defendant also contends that the DNA evidence was unfairly prejudicial, and thus inadmissible under Indiana Evidence Rule 403.

Before advancing to the specifics of defendant's argument, we find it necessary to provide some background information. DNA, an acronym for deoxyribonucleic acid, is the genetic material found in the nucleus of our cells; it provides the master plan for the cells of our body. Ninety-nine percent of everyone's DNA is exactly the same. The remaining small percentage is unique to each individual but identical twins.

DNA is structured in a double helix which, if straightened out, resembles a ladder. Each rung of the ladder is made of a pair of bases, of which there are four possibilities: adenine (A), guanine (G), cytosine (C), and thymine (T). To form the rungs, A always pairs with T and G always pairs with C. Thus, if the sequence on one side of a DNA strand is known, then the other side can be determined.

A gene is a segment of DNA and can comprise varying numbers of base pairs. Some genes are located on regions of the DNA which are called polymorphic sites; these sites contain the variability which make each of us unique. Each of the individual possibilities at a polymorphic site is called an allele. We receive one allele from each parent. If we receive the same allele from each parent, then we are homozygous at that site. If we receive a different allele from each parent, then we are heterozygous at that site. The combination of alleles for a gene is commonly referred to as its genotype.[1]

Based upon the foregoing knowledge, scientists are able to analyze a DNA sample. One method, the one used in this case, is the Polymerase Chain Reaction (PCR). PCR is a method by which chosen short polymorphic segments of a DNA strand can be amplified (or copied) millions of times. This amplification is done in steps. Essentially what happens is that a double strand of DNA is separated by heat into its single strands. Then, specified areas of each DNA strand are marked and replicas are made so that there are now two identical double strands of that area. This process is repeated 20–35 times, thus producing an enormous number of copies of the original marked strand. The PCR process makes it possible to analyze what was originally a very small quantity of DNA.

Once a large enough sample of DNA exists, tests can be done on the sample to determine what alleles are present at the specified areas. The tests that were used in this case are the DQ Alpha (DQA), Polymarker (PM), and D1S80. In total, these tests determine what alleles are present at seven different polymorphic sites. Based on the genotypes of these seven sites, the scientist can determine the DNA's profile. Once the profile is determined, it can be compared to anyone's profile. For example, in this case, the profiles of the blood from the towel and the shoe were compared to defendant's and Nobile's profiles.

If the profiles of the sample and an individual are different, then the individual can be excluded as a contributor of the DNA sample. If, however, the profiles match, then the individual cannot be ruled out as a contributor. Instead, the scientist must next determine how common it is to have that profile. This determination is made by comparing the genotypes from the sample to the genotypes of a database. The database is garnered from a larger population, separated into racial and/or ethnic groups, and shows, by percentage, how common each different genotype possibility is amongst each population. Once the comparison determines the percentage of the population that has each of the different genotypes, all of the percentages can be multiplied together (the "Product Rule") to determine what percentage of the population has all seven of the genotypes and, thus, fits the DNA's profile.[2]

1. For example, if there are only two possible alleles at a particular site (A or B), then a person can have two homozygous genotypes (AA or BB) or one heterozygous genotype (AB). As another example, if there are three possible alleles at a particular site (A, B, or C), then a person can have three homozygous genotypes (AA, BB, or CC) and three heterozygous genotypes (AB, AC, or BC).

2. For example, in the present case, the State conducted the DQA, PM, and D1S80 tests on the blood from the towel and shoe. The alleles at

On appeal, defendant argues that the Polymerase Chain Reaction methodology or PCR process, and more specifically, the PM and D1S80 tests are scientifically unreliable, that the frequency calculations are unreliable, and that flaws in the handling of evidence and conducting the tests make the results unreliable.[3] Defendant also argues that the evidence presents a danger of unfair prejudice. As we have noted previously, "the words 'DNA test results' are not magic words which, once uttered, cause the doors of admissibility to open." *Harrison v. State,* 644 N.E.2d 1243, 1251 (Ind.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1997). Like any other evidence, and notwithstanding Indiana Code section 35–37–4–13(b), DNA evidence presented by expert testimony must satisfy the requirements of the Indiana Rules of Evidence. *See Jervis v. State,* 679 N.E.2d 875, 881 (Ind.1997). In this case, the relevant rules require that the expert be qualified to testify, the trial court be satisfied that the scientific principles upon which the expert testimony rests are reliable, and the testimony's probative value is not substantially outweighed by the dangers of unfair prejudice. Ind. Evidence Rules 403, 702; *see Harrison,* 644 N.E.2d at 1252. We review the trial court's evidentiary decisions for an abuse of discretion. *Jervis,* 679 N.E.2d at 881; *McGrew v. State,* 682 N.E.2d 1289, 1290 (Ind. 1997). Defendant's arguments concern only the reliability of the scientific principles and the potential prejudice. We will address each argument in turn.

### A. The Polymarker and D1S80 tests

Defendant argues that the PM and D1S80 tests are not scientifically reliable and, thus, testimony on them is inadmissible under Indiana Evidence Rule 702(b). We disagree. During the suppression hearing, the State and the defendant proffered numerous highly qualified experts to testify as to the reliability of these tests. For example, Dr. Michael Conneally, a Professor of Medical Genetics and Neurology at Indiana University, Dr. Bruce Budowle, Chief of the Forensic Science Research Unit in the FBI Academy, and Dr. David Bing, Director of Clinical Testing at Harvard's Center for Blood Research Laboratories testified as to the general acceptance, use, and reliability of the kits. In opposition, Dr. Donald E. Riley, a faculty member of the University of Washington Departments of Urology and Pathobiology, testified as to the unreliability of the PM and D1S80 tests. Sandy L. Zabell, a professor of mathematics and statistics at Northwestern University, also testified for the defense as to possible statistical errors in the test results produced.

In addition to expert testimony, the State submitted the National Research Council's 1996 Evaluation of Forensic DNA Evidence ("NRC"), which states that the PM and D1S80 tests have been validated and that "the state of the profiling technology and the methods for estimating frequencies and related statistics have progressed to the point where the admissibility of properly collected and analyzed DNA data should not be in doubt." (R. at 2955–56.) Finally, other courts accept the reliability of the PM and D1S80 tests. *See Beasley,* 102 F.3d at 1446–48; *Gaines,* 979 F.Supp. at 1435–41; *Sok,* 683 N.E.2d at 680–81. The trial court prop-

---

seven cites were checked, and the frequency of each of the seven genotypes was calculated for the Caucasian and Black populations. Then, the seven frequencies were multiplied together to determine the frequency of having all seven. For the towel, the calculation came to 0.0024% in the Caucasian population and 0.0000094% in the Black population. These percentages convert to 1 in 41,666 and 1 in 10,638,297 respectively. Thus, it can be expected that 1 in 41,666 persons in the Caucasian population would have this particular profile. For the shoe, the calculations came to 1 in 21,739,130 for the Caucasian population and 1 in 35,714,285,714 for the Black population.

**3.** At trial, defendant conceded that the PCR process and the DQA test are scientifically reliable and generally accepted. As such, we need not address their admissibility. However, it is worth noting that we recently held that the PCR methodology is scientifically reliable, *Ingram v. State,* 699 N.E.2d 261 (Ind.1998), which is amply supported by case law. *See United States v. Beasley,* 102 F.3d 1440 (8th Cir.1996) (concerning PCR and DQA), *cert. denied,* —— U.S. ——, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1998); *United States v. Gaines,* 979 F.Supp. 1429 (S.D.Fla.1997) (concerning PCR and DQA); *State v. Begley,* 956 S.W.2d 471 (Tenn.1997) (concerning PCR); *Commonwealth v. Sok,* 425 Mass. 787, 683 N.E.2d 671 (1997) (concerning PCR and DQA).

erly found that the PM and D1S80 tests are scientifically reliable.

## B. Testing Flaws

Defendant presents several arguments as to why the tests in this case should have been inadmissible. For example, defendant contends that mishandling of the evidence contaminated the samples and led to faulty results, the results from testing the shoe cannot be valid, the police lab failed to conduct proper controls during the testing, and the police lab was not accredited. Defendant's contention is that these flaws in the present case made the PM and D1S80 tests unreliable and, thus, inadmissible as evidence.

■ While a case may exist wherein "substantial irregularities [in the testing procedures] would be a basis for prohibiting admission of test results," in general, any irregularities go to the weight of the evidence, not its admissibility. *Davidson v. State*, 580 N.E.2d 238, 243 (Ind.1991); *see Beasley*, 102 F.3d at 1448; *Begley*, 956 S.W.2d at 478; *Sok*, 683 N.E.2d at 682–83. As we will discuss in the following paragraphs, the trial court did not commit an abuse of discretion by admitting the evidence and letting the jury determine the weight of the evidence.

■ First, defendant argues that the likelihood of contamination due to improper collection and handling makes the evidence inadmissible. As defendant rightly notes, the PCR method amplifies whatever DNA exists in the sample. Defendant's concern is that, due to improper handling of the evidence (for example people touching the towel and shoe without gloves), there is a chance that the handlers may have transferred some of their own DNA to the evidence and, thus, contaminated the evidence. Two of the State's experts agreed that contamination can be a problem in some situations, for example if someone sneezed onto the sample. However, they also testified that simply breathing on or touching the sample is unlikely to have much of an impact because the DNA present in the sample will overpower the small amount of contamination. Furthermore, the experts testified that the test results showed no evidence of any contamination. Any concerns that exist in this respect go to the weight of the evidence, not its admissibility.

Second, defendant argues that the test on the shoe cannot be valid. Specifically, defendant contends that the test was done on a leather portion of the shoe, and leather acts as an inhibitor which prohibits obtaining interpretable results. However, the record shows that the results in question were obtained from a piece of thread, not from any leather portion of the shoe. Thus, this argument is without merit.

■ Third, defendant argues that the police lab failed to conduct control tests on the samples. Specifically, defendant contends that the lab failed to do a test on the background material in order to determine its DNA and that the lab failed to do two gel control tests.[4] However, the record shows that these tests are not absolutely necessary unless the original tests show mixed or incomplete results. Any concerns in this respect go to the weight of the evidence, not its admissibility.

Fourth, defendant argues that the Indiana State Police laboratory lacks accreditation, and that this affects the reliability and admissibility of the evidence. However, the lab was accredited by the American Society of Crime Lab Directors in 1990. Furthermore, the lab runs its tests under controlled conditions, follows specific protocols, and conducts quality testing on the kits and the analysts. Any concerns in this respect go to the weight of the evidence, not its admissibility.

## C. The Frequency Calculations

■ Defendant argues that the frequency calculations done in this case are scientifically unreliable for two reasons: 1) because the State did not use confidence intervals [5] when

---

4. The test on the background material is called a substrate control test. The two gel control tests are called the Product Gel test and the Yield Gel test. The Product Gel control test determines whether amplification of the DNA occurred. The

Yield Gel test determines the quality of the amplified DNA.

5. A confidence interval is used "to account for the fact that match probabilities are based on

presenting the frequency calculations to the jury and 2) because one of the Polymarker sites checked is in linkage disequilibrium with other of the Polymarker sites. We disagree. First, the State's failure to offer the confidence intervals to the jury has no bearing on the initial reliability determination. Second, the State presented sufficient evidence to establish that the results were not skewed by linkage disequilibrium. Linkage disequilibrium and the unreliable frequency calculations that flow therefrom occur when dependent frequency markers are multiplied together.[6] In this case, no linkage disequilibrium can be found. The State's expert properly applied the Product Rule by multiplying two independent frequency markers to obtain the frequency calculations.[7] Even still, defendant's attacks go to the weight of the evidence, not its admissibility. *See Jenkins v. State*, 627 N.E.2d 789, 794 (Ind.1993). The trial court did not abuse its discretion by admitting the evidence.

### D. Rule 403

■ Defendant also contends that the State's errors in conducting the DNA tests and in presenting the evidence to the jury were such that the prejudice created by admission of the evidence substantially outweighs its probative value. Ind. Evidence Rule 403. The alleged errors, such as the handling of the evidence, the failure to do some control tests, and the failure to use confidence intervals, are discussed more fully in the above discussions.

The trial court did not abuse its discretion by admitting the evidence. The DNA evidence is highly probative as it helps link defendant to the crime. For every element of alleged prejudice, the State presented evidence either that there was no prejudice or that the potential prejudice was only slight. For example, all of the tests were shown to

be scientifically valid and generally accepted. Also, evidence showed that the lab followed strict protocol and that tests had internal control mechanisms. Finally, the tests showed no evidence of contamination.

### E. Conclusion

We conclude with the following points. One, the DQA, PM, and D1S80 tests which incorporate PRC technology, and the Product Rule used to determine frequency calculations are scientifically reliable. Qualified expert witnesses can testify about results derived from the process and tests. Two, the vast majority of questions concerning the manner in which the PCR process, the DQA, PM, D1S80 tests, or the Product Rule calculations were conducted in a particular case go to the weight of the evidence, not its admissibility. Three, in this case, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice or confusion of the jury. The trial court did not abuse its discretion by admitting the evidence.

### II.

Defendant argues that the trial court erred by failing to exclude the results of tests conducted on the towel. During trial, the court ordered the State to allow defendant's expert to be present at any blood testing. Kimberly Epperson, the police analyst who originally tested the towel, conducted a test on the towel without defendant's expert being present. Defendant filed a motion to exclude the evidence because Epperson's test violated the court order. The trial court denied the motion. Defendant interchangeably makes two different arguments why the denial requires a reversal. First, defendant argues that the trial court should have excluded the evidence because of the discovery violation. Second, defendant argues that his

different databases and might change if another data set were used." (R. at 2999.) The 1996 NRC report recommends that, when using the Product Rule, the uncertainty of a specific profile should be shown by a factor of 10. In other words, if the profile's frequency calculation amounts to 1 in 10,000, then the confidence interval would show the probability of a match as being somewhere between 1 in 1000 and 1 in 100,000.

6. Frequency markers are dependent when the parents are related.

7. The Product Rule works because all of the sites checked are typically inherited independently of each other. Genes that are inherited independently of each other are in linkage equilibrium.

due process rights were violated by the State's actions. We will address each in turn.

■ The trial court is accorded broad discretion in ruling on violations of discovery orders. *Taylor v. State,* 676 N.E.2d 1044, 1046 (Ind.1997), *reh'g denied,* (May 16, 1997). On review, we will reverse only for an abuse of discretion. *Id.* The "exclusion of evidence as a discovery abuse sanction is proper only where there is a showing that the State engaged in deliberate or other reprehensible conduct that prevents the defendant from receiving a fair trial." *Id.*

■ The trial court did not abuse its discretion by denying defendant's motion to exclude the evidence. Though Epperson apparently violated the discovery order, her doing so in no way prevented defendant from receiving a fair trial. Epperson tested only a small portion of the towel, and the rest of the towel, including portions with the blood stain, was resealed, retained, and remained available for testing.

Defendant's second argument rests on the premise that the evidence should be excluded because there is a possibility that Epperson contaminated the entire sample while defendant's expert was not watching. Defendant asserts that this would be the equivalent of destroying the evidence and that, therefore, the evidence should be excluded. Assuming without deciding that this issue was raised at trial, we nonetheless hold that it is without merit. While it is true that the failure to preserve potentially useful evidence may constitute a denial of due process if the defendant can show bad faith on the part of police, *Bivins v. State,* 642 N.E.2d 928, 943 (Ind. 1994) (citing *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)), defendant can point to nothing but idle speculation as evidence that Epperson contaminated the towel. Instead, the evidence shows that the towel was available, in the same condition, for testing after Epperson conducted her original tests.

## III.

Defendant next argues that the trial court erred by admitting the deposition of an un-available witness. Kimberly Epperson, formerly a forensic DNA analyst for the Indiana State Police, conducted DNA tests on the evidence in this case. On November 1, 1995, defendant deposed Epperson. On November 29, 1995, Epperson died in a car crash. On February 15, 1996, defendant filed a motion to suppress the deposition. After a hearing, the trial court denied the motion. Defendant renewed the motion at trial, and it was again denied. The State read Epperson's deposition into evidence. Defendant argues that the trial court erred because defendant did not have the opportunity to fully cross-examine Epperson.

■ The admission of depositions into evidence is within the discretion of the trial court, and we will reverse the trial court's decision only for an abuse of that discretion. *Kellems v. State,* 651 N.E.2d 326, 328 (Ind. Ct.App.1995). When a witness is unavailable to testify at trial because of death, a prior deposition may be admissible as evidence if the party opposing the deposition had a full and fair opportunity to cross-examine the witness during the deposition and had the same or similar motives in questioning. *See State v. Owings,* 622 N.E.2d 948, 950–52 (Ind.1993); *see also* Ind. Evidence Rule 804; Ind. Trial Rule 32(A)(3)(a).

■ In the present case, defendant was fully able to and did cross-examine Epperson during the deposition, and he had the same motives then as he would have had at trial. He asked Epperson about her background and training, about the accreditation of the lab, about the protocol for testing at the lab, about the quality control at the lab, about her involvement with this case, about her interaction with the evidence in this case, about her testing and results in this case, and many other questions. Defendant's main concern on appeal seems to be that he was unable to attack Epperson's credibility. However, at trial, defendant was fully able to explore Epperson's qualifications and proficiency via her lab supervisor and prior proficiency tests. Defendant was also able to cross-examine Todd Bille, another analyst in the police lab, who reviewed Epperson's findings and did his own tests and calculations. The

trial court did not abuse its discretion by admitting the deposition.

### IV.

Defendant argues that the prosecutor made improper comments during closing argument which improperly shifted the burden of proof to defendant and denied him a fair trial. Defendant objects now, as he did at trial, to two specific comments made by the prosecutor. The first comment concerned Epperson's DNA testing of the shoe: "Now, ladies and gentlemen, let me submit to you that if Kimberly Epperson made any mistakes, did anything wrong, deviated from the protocol[,] that Ms. Randon [defendant's expert] would have---" (R. at 4197.) The second comment concerned one of defendant's experts: "Who did the defendant bring in here to talk to you about the DNA evidence. You saw him, Dr. Riley from Seattle, Washington, professional witness. He never even ran the tests. There was plenty of this towel sample left." (R. at 4202.) The trial court sustained defendant's objection to the first comment, struck the comment from the record, and admonished the jury. The trial court overruled defendant's objection to the second comment.

In evaluating a prosecutorial misconduct claim, this Court first determines whether the prosecutor engaged in misconduct and then determines whether the misconduct had a probable persuasive effect on the jury's decision. *Cox v. State*, 696 N.E.2d 853, 859 (Ind.1998). As to the first claim of prosecutorial misconduct, the trial court immediately struck the comment and admonished the jury. As such, any potential error caused by this comment was cured. *See Wright v. State*, 690 N.E.2d 1098, 1111 (Ind. 1997), *reh'g denied,* (April 23, 1998). As to the second comment, we do not believe that the prosecutor committed any misconduct as the comments simply presented evidence from trial—that the defendant's expert did not run any DNA tests on the evidence. *See Cox,* 696 N.E.2d at 860. Assuming, however, that the comments were improper, we do not believe that they had any probable persuasive effect on the jury's verdict. In its preliminary and final instructions, the trial court

informed the jury that a person charged with a crime is presumed innocent unless the State proves defendant guilty beyond a reasonable doubt of each element of the crime charged and that the "defendant is not required to present any evidence to prove his innocence or to prove or explain anything." (R. at 470, 521.) Given these instructions, the weight of the evidence, and the de minimis nature, if any, of the impropriety, no reversible error exists. *See Wright,* 690 N.E.2d at 1112.

### V.

Defendant's final argument concerns the sufficiency of the evidence presented at trial. Defendant contends that the evidence presented at trial was either highly circumstantial or questionable and is insufficient to sustain his convictions.

When called upon to address a sufficiency of the evidence argument, this Court neither weighs the evidence nor judges the credibility of the witnesses. *Roach v. State,* 695 N.E.2d 934, 941 (Ind.1998). These functions are reserved for the trier of fact. The function of the reviewing court is to consider all evidence favorable to the jury's verdict, along with any reasonable inferences to be derived therefrom, in order to determine whether there is substantial evidence of probative value from which a jury could find guilt beyond a reasonable doubt. *Id.* If so, we will affirm. *Id.*

In the present case, the State provided sufficient evidence to support defendant's convictions. The evidence shows that defendant was in the bar near the time of the murder, that he knew about Nobile and her bar habits, that he was seen with blood on his pants the afternoon of the murder, that he was spending large amounts of cash right after the murder and robbery, that he admitted his involvement in the crime to a cellmate, that his DNA matched DNA in blood found at the scene of the murder, and that DNA found in blood on his shoe matched Nobile's DNA. Also, witnesses' testimony is supported by the physical evidence presented at trial. The State established sufficient evi-

dence to support the defendant's murder conviction.

### CONCLUSION

We affirm the trial court.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.