Charles J. KENNEDY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 89A04–0907–CR–380.

Court of Appeals of Indiana.

Oct. 6, 2010.

---

Adam G. Forrest, Boston Bever Klinge Cross & Chidester, Richmond, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Charles Kennedy appeals his convictions and sentence for Class A felony robbery and Class A felony conspiracy to commit robbery. We affirm.

### Issues

The issues before us are:

I. whether the trial court properly admitted DNA evidence tending to implicate Kennedy in the robbery;

II. whether the trial court properly permitted the testimony of a witness who was not discovered by the State until mid-trial; and

III. whether Kennedy's sentence is inappropriate.

### Facts

The evidence most favorable to the convictions is that on the evening of April 2, 2007, sixteen-year-old Kennedy and Derek Willis, while driving around Richmond in Kennedy's truck, discussed beating up and robbing someone. At around 10:00 p.m., Kennedy and Willis saw Joseph Augustin walking along the street, and they decided to get out of the truck and follow him.

Willis picked up a rock, and Kennedy picked up a chunk of asphalt, and they followed Augustin onto a bridge. Willis first threw the rock at Augustin's leg, but Augustin continued to walk away. Kennedy then approached Augustin and hit him in the face with the asphalt, causing him to fall to the ground and bleed profusely. Kennedy took Augustin's wallet, which he later discarded. Willis took a backpack Augustin had been carrying, which contained a laptop computer. Augustin later sought help at a nearby video store, but he could not remember anything about the attack. He suffered a fractured skull and a collapsed lung as a result of the attack.

A couple of weeks later, Willis confessed to police and also told them of Kennedy's role in the robbery. On April 18, 2007, the State charged Kennedy and Willis with one count of Class A felony robbery. On October 18, 2007, Kennedy and Willis both filed joint sentence recommendations with the trial court, which were effectively plea agreements. According to the agreements, both Kennedy and Willis would plead guilty to Class B felony robbery, with Willis receiving a sentence of fifteen years with five years suspended and Kennedy receiving a sentence of twenty years with five years suspended. Willis followed through with his plea and was sentenced accordingly. Kennedy, however, obtained new counsel and moved to withdraw his agreement, which motion the trial court granted on November 27, 2007. On January 29, 2008, the State amended the information against Kennedy to include the Class A felony conspiracy to commit robbery charge. Trial originally was set for June 2, 2008.

Meanwhile, the State began conducting DNA testing on the piece of asphalt that had been used to bludgeon Augustin.

Indiana State Police ("ISP") lab DNA analyst Nicole Keeling first analyzed a swab from the asphalt to determine what DNA alleles were present at each of fifteen different loci used in making DNA identifications.[1] Then, she compared those loci and their alleles to a sample of Augustin's DNA. On May 9, 2008, Keeling issued a certificate of analysis stating that, unless he had an identical twin, Augustin was the source of the major DNA profile found on the asphalt to a reasonable degree of scientific certainty. However, Keeling also indicated that there were extra alleles found on the asphalt, not consistent with Augustin's DNA profile, that led her to believe there was a minor contributor of a different DNA profile on the asphalt.

After receiving this document, the State sought a search warrant to obtain an oral swab from Kennedy to compare his DNA to the extra alleles, or possible minor DNA profile, found on the asphalt.[2] Kennedy fought this request, but the trial court granted it. In light of the ongoing DNA testing, the trial court also sua sponte continued the trial date from June 2, 2008 to September 29, 2008, over the State's objection but without objection by the defense.

On July 2, 2008, Keeling issued a new certificate of analysis, which confirmed that Augustin was the contributor of the major DNA profile found on the asphalt to a reasonable degree of scientific certainty. Keeling also concluded in this report that Kennedy "cannot be excluded as a possible contributor of the additional alleles" found on the asphalt.[3] Ex. 37. On August 4, 2008, Keeling issued a third certificate of analysis, making the same two findings, but additionally finding that Willis could "be excluded as a possible contributor of the additional alleles" found on the asphalt. Ex. 38. There was one allele at one loci that could not be accounted for.

Meanwhile, Kennedy had, on July 10, 2008, filed a motion to exclude any DNA evidence from the trial based on the State's alleged failure to comply with discovery deadlines with respect to that evidence. The trial court held a hearing on this motion on August 13, 2008. At the hearing, defense counsel expressed concern that the State's late disclosure of the DNA testing results would make it impossible for her to comply with a pre-existing deadline that any experts hired by her complete their analysis of the lab results by August 27, 2008. The trial court denied the motion to exclude the DNA evidence, but granted defense counsel until September 12, 2008, to complete her own analysis of the evidence. Defense counsel responded that the new deadline was "perfect." Tr. p. 278.

On September 15, 2008, Kennedy filed a motion to exclude Keeling's conclusions regarding the DNA evidence. The basis for this motion was a claim that the manner in which Keeling had conducted her analysis did not comport with accepted scientific principles. The trial court conducted a hearing on this motion on September 24, 2008, and subsequently denied the motion.

Keeling's trial began as scheduled on September 29, 2008. At trial, Kennedy

---

1. Sixteen loci actually were tested, but the sixteenth loci, amelogenin, merely indicates the gender of the DNA contributor and is not very useful in making identifications.

2. Epithelial cells, which are found in skin, contain DNA that may be transferred to an object by touch.

3. Using only nine of the fifteen loci as her basis, Keeling also calculated the probability that Kennedy's DNA was present on the asphalt. At trial, however, this frequency calculation was not presented to the jury, per stipulation by the State and defense.

renewed his objection to the State's introduction of DNA evidence identifying him as having possibly touched the asphalt. Kennedy presented as a witness Ranajit Chakraborty, a nationally-recognized DNA analysis expert who expressed strong disagreement with the manner in which Keeling conducted parts of her testing. The trial court overruled Kennedy's objection to the DNA evidence.

On October 8, 2008, in the midst of trial, the State informed Kennedy and the trial court that they had just learned of a potential new witness, Megan Felty. Felty had been Kennedy's classmate at Richmond High School and claimed that he had told her, in October 2007, of his participation in the robbery. She had not told anyone of what Kennedy had said until October 8, 2008, when she told her father, who in turned called the prosecutor's office. Kennedy objected to permitting Felty to testify. The trial court offered a one-day continuance of the trial in order to permit defense counsel to investigate Felty's expected testimony, but counsel refused the offer and did not request a continuance of a different length. A deposition of Felty was conducted after-hours on October 9, and apparently depositions of other witnesses related to Felty's disclosure took place on October 12, 2008. On October 13, 2008, the trial court decided to allow Felty to testify, and she did so on October 16, 2008. Defense counsel conducted an extensive cross-examination of Felty during trial.

On October 23, 2008, the jury found Kennedy guilty as charged. On May 20, 2009, the trial court sentenced Kennedy to twenty-seven years with three years suspended on each Class A felony charge, with the sentences to run concurrently. Kennedy now appeals.

## Analysis

### I. Admission of DNA Evidence

 Kennedy's challenge to the admissibility of the DNA evidence is twofold: he challenges it on procedural grounds for alleged violation of discovery rules, and on substantive grounds for the State's alleged failure to establish the scientific veracity of the test results. Turning first to the procedural challenge, we observe that trial courts have broad discretion in dealing with discovery violations by the State in the alleged late disclosure of evidence to the defense. *Berry v. State,* 715 N.E.2d 864, 866 (Ind.1999). We may reverse the manner in which the trial court deals with such an alleged violation only for an abuse of that discretion involving clear error and resulting prejudice. *Id.* "Generally, the proper remedy for a discovery violation is a continuance." *Id.* Exclusion of the evidence at trial is an extreme remedy that is warranted only if the State's actions were deliberate and its conduct prevented a fair trial. *Id.*

Even if we were to find that some of the State's disclosures of the DNA test results technically were untimely under the trial court's case management schedule, we cannot say the trial court abused its discretion in refusing to exclude those results from trial. There is no indication in the record that any delays in obtaining the test results from the ISP lab were the result of deliberate conduct by the State intended to prejudice Kennedy. Additionally, it appears that Kennedy was given sufficient time to prepare a defense in response to the test results. At the August 13, 2008 hearing on Kennedy's motion to exclude the results for discovery violations, defense counsel clearly indicated that her main concern with the alleged late disclosure was an inability to have her own expert or experts analyze the results. In response, the trial court extended the deadline under

the case management schedule by approximately two weeks to allow her to analyze the results; defense counsel indicated this extension was "perfect." Tr. p. 278. At trial, defense counsel brought in a nationally-recognized expert witness, Chakraborty, who vigorously challenged the underpinnings of Keeling's test results. As such, it appears that any difficulties created by the alleged late disclosure of the test results were sufficiently cured by the trial court's alteration of the case management schedule and that Kennedy was not prejudiced by the alleged late disclosure.

■ We now address the more complex issue of whether the trial court erred in concluding that Keeling's test results, specifically that Kennedy could not be excluded as a contributor of DNA found on the asphalt, were sufficiently scientifically reliable to be admissible.[4] The phrase "DNA test results" is not a magic one that " 'once uttered, cause the doors of admissibility to open.' " *Smith v. State,* 702 N.E.2d 668, 672 (Ind.1998) (quoting *Harrison v. State,* 644 N.E.2d 1243, 1251 (Ind.1995), *cert. denied* ). Rather, and notwithstanding Indiana Code Section 35–37–4–13(b),[5] DNA evidence presented by expert testimony must satisfy the requirements of the Indiana Rules of Evidence, including Rule 702. *Id.* Rule 702 states:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may

testify thereto in the form of an opinion or otherwise.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

We review a trial court's evidentiary decisions for an abuse of discretion. *Smith,* 702 N.E.2d at 672.

■ Here, Kennedy conceded that Keeling possesses the requisite skill, training, and experience to qualify as an expert in the field of DNA forensic analysis. He also has conceded that the ISP lab is properly accredited and has adopted scientifically acceptable methods for DNA testing. Indeed, Kennedy's expert Chakraborty examined the ISP lab's manual regarding DNA testing and testified that he found it complied with acceptable scientific guidelines. Additionally, Keeling utilized the Polymerase Chain Reaction ("PCR") method for the DNA analysis she conducted in this case. That method, through which small DNA samples can be "amplified" in order to permit testing, has passed general muster in Indiana for scientific reliability and admissibility in evidence at trial. *Ingram v. State,* 699 N.E.2d 261, 263 (Ind.1998). Once the reliability of a particular scientific process is established and an expert's qualifications to carry out the testing are not in doubt, questions as to how an expert personally carried out the testing in a particular case generally go to the weight of the evidence, not its foundational admissibility. *Id.* at 263 n. 7. It is only when there are *substantial* irregularities in a testing process

4. The State argues that any error in admission of the DNA results should be considered harmless, especially given the testimony of Willis implicating Kennedy. We are reluctant to dismiss DNA test results, here tending to indicate Kennedy may have handled the asphalt used to bludgeon Augustin, as harmless.

5. This statute states, "In a criminal trial or hearing, the results of forensic DNA analysis are admissible in evidence without antecedent expert testimony that forensic DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material."

that the line may be crossed into the results being inadmissible. *See Smith,* 702 N.E.2d at 673.

Kennedy's substantive challenge to the DNA evidence here goes to the particular manner in which Keeling personally conducted the testing in this case, much as was the case in *Ingram.* From the hearing on the motion to exclude the DNA test results and the subsequent offer to prove by Kennedy during trial regarding this evidence, it appears that he largely is challenging the manner in which Keeling "called" the existence of alleles recovered from the asphalt and the subsequent matching of those alleles to ones matching Kennedy's DNA profile.[6]

As an overview, DNA forensic testing and comparison is accomplished by analyzing certain polymorphic sites, or loci, on the DNA strand.[7] At each locus a person will have either one or two alleles, which are represented by numbers in the DNA analysis process. When a DNA analyst is presented with a sample from an object, such as the asphalt in this case, the first step is to "call" which alleles are present at predetermined loci. Here, in accordance with ISP lab procedures, Keeling first analyzed fifteen loci (not counting the sex-determinative loci) from the swab taken from the asphalt. The presence of an allele is measured by a standard known as relative reflective units ("RFUs"). Essentially, the higher the RFU number, the more definitive the presence of an allele. The ISP lab, after conducting numerous experiments on the subject, has decided that 80 RFUs is the minimum by which an analyst may "call" the presence of an al-

lele. The vendor who provided the DNA testing equipment to the ISP lab recommends a minimum level of 150 RFUs. However, Carl Sobieralski, technical leader of ISP lab biology section who also evaluates other forensic labs across the country, testified that the 80 RFUs threshold is not out of line with standards adopted by other labs. Alleles in the 80 to 150 RFUs range, however, must be "called" conservatively. This is because purported alleles in that range may in fact be the product of "stutter," which is an aberration that sometimes arises in the PCR amplification process.

After analyzing the swab from the asphalt, and without knowing the DNA allele profiles of any of the relevant persons (i.e. Augustin, Kennedy, or Willis), Keeling was able to establish a major DNA profile for the sample, based on the presence of either one or two alleles with very high RFU numbers at each of the fifteen loci. However, she also discovered at several loci the presence of other "extra" alleles with much lower RFU numbers. Some of these alleles she decided were "stutter". Other alleles she did not believe constituted "stutter," so she left them in her analysis as indicative of the presence of a minor DNA profile that was mixed in with the major profile. In her May 9, 2008 certificate of analysis, Keeling was able to compare the major profile with Augustin's known profile, but she did not yet have DNA profiles from Kennedy or Willis. After she obtained Kennedy's DNA sample, she found that all but one of the "extra" alleles she had "called" were consistent

6. At the pretrial hearing, there was much discussion regarding the accuracy of Keeling's frequency calculations tying Kennedy to the minor DNA profile on the asphalt. At trial, those calculations were not presented to the jury and we need not address that issue.

7. 99.9% of everyone's DNA is identical. It is the polymorphic DNA sites that allow for unique individualization and differentiation between people. *See Smith,* 702 N.E.2d at 671.

with Kennedy's profile.[8]

Kennedy contends that Keeling improperly exercised too much discretion in calling (or not calling) the existence of alleles in the first place. Chakraborty criticized Keeling's non-calling of "extra" alleles that were inconsistent with Kennedy's profile, while noting (with one exception) that she only called those that were consistent with Kennedy. He also pointed out that after obtaining Kennedy's DNA profile, she compared it against the asphalt sample while knowing that the profile belonged to him; i.e., the testing was not "blind." The suggestion appears to be that Keeling, knowing Kennedy's profile, only called alleles from the rock sample that matched his, either subconsciously or purposely. This ignores the fact, however, that Keeling first tested the rock sample and called the alleles she believed existed on it well before Kennedy's profile was known.

Kennedy is challenging the very highly technical details of how Keeling conducted her testing. We believe this is the very reason the rules of evidence provide for expert witness testimony. The details of how DNA testing is conducted are beyond the ready grasp of laypersons, or judges and lawyers for that matter. Furthermore, DNA testing is not always a black-and-white science. Keeling, whom Kennedy recognizes as a qualified expert in this field, testified that DNA analysts almost always have to exercise some degree of discretion in testing. Chakraborty also agreed that trained and qualified DNA analysts can have reasonable disagreements regarding proper test results. We believe this clearly is a case where the dispute between Keeling and Chakraborty regarding the precise details of her testing methods goes to the weight of her results,

not their admissibility. Kennedy was permitted to and in fact did present to the jury a detailed critique of Reeling's methods. The trial court did not abuse its discretion in admitting the results into evidence.

## II. Felty's Testimony

 Next, we address the trial court's decision to permit Megan Felty to testify even though she was not discovered as a State's witness until the middle of Kennedy's trial. Trial courts are granted wide discretion in determining whether to allow testimony from witnesses not listed on a pre-trial discovery witness list. *F.E.H., Jr. v. State*, 715 N.E.2d 1272, 1274 (Ind.Ct.App.1999). Exclusion of the testimony of a late-discovered witness is granted only if the State has blatantly and intentionally failed to provide discovery or if the exclusion is necessary to avoid substantial prejudice to the defendant. *Mers v. State*, 496 N.E.2d 75, 83 (Ind.1986). The granting of a continuance generally is the proper remedy for the late disclosure or discovery of a witness "unless the State's action is so misleading as to demonstrate such bad faith that exclusion of the evidence is necessary to protect the defendant's fair trial rights." *Id.*

 Additionally, "[f]ailure to alternatively request a continuance upon moving to exclude evidence, where a continuance may be an appropriate remedy, constitutes a waiver of any alleged error pertaining to noncompliance with the court's discovery order." *Warren v. State*, 725 N.E.2d 828, 832 (Ind.2000). Here, Kennedy did not request a continuance in conjunction with his motion to exclude Felty's testimony. In fact, he refused the trial court's offer of a one-day continuance in order to investi-

---

8. At some loci, Kennedy had alleles that precisely matched both Augustin's profile and the asphalt sample. There also were some loci containing no measurable alleles corresponding with Kennedy's profile.

gate Felty and her possible testimony further. Kennedy has waived any claim of error with respect to the trial court's decision to permit Felty to testify.

■ Waiver notwithstanding, we cannot conclude the trial court abused its discretion in permitting Felty to testify. For guidance, we turn to *Wilson v. State*, 533 N.E.2d 114 (Ind.1989), which is much like the present case. There, at the beginning of the third day of trial, the State disclosed that it had learned of two new witnesses at the end of the previous day's proceedings. These witnesses had not been on the pretrial witness list and the State previously had been unaware of their existence. Both witnesses were subpoenaed to appear and gave statements that evening, which were turned over to defense counsel the next morning. Defense counsel was given the opportunity to go over the statements with the witnesses, and one full day elapsed before the defendant presented his case. Because there was no indication "that the State attempted to evade the court's discovery order or that there was any attempt to trick or mislead appellant," our supreme court concluded that "[u]nder such circumstances, the trial court was well within its discretion to permit the witnesses to testify." *Wilson*, 533 N.E.2d at 117.

Here, there is no evidence the State was holding an "ace in the hole" with respect to Felty and her testimony. Felty (or more accurately her father) approached the State; the State did not discover her through its own investigation. The State was just as surprised by her as Kennedy was. Her existence was disclosed to defense counsel as soon as the State learned of her. Our supreme court has observed generally that there is no error in the late disclosure of evidence when the State provides a defendant evidence as soon as the State is in possession of it. *Warren*, 725

N.E.2d at 832. Defense counsel was able to depose Felty, as well as several other witnesses with information related to Felty's testimony. Felty did not testify for seven days after she was discovered; when she did testify, defense counsel was able to vigorously cross-examine her. Certainly, it is never an ideal situation for a witness' to be newly-discovered in the midst of trial, which creates added pressure on counsel at an already stressful time. Nevertheless, where there is no indication the State engaged in any misconduct and defense counsel had an opportunity to investigate Felty and her testimony, we cannot say the trial court abused its discretion in permitting her to testify.

### III. Sentence

■ Finally, we address Kennedy's argument that his aggregate twenty-seven-year sentence, with three years suspended, is inappropriate pursuant to Indiana Appellate Rule 7(B) in light of his character and the nature of the offense. Although Rule 7(B) does not require us to be "extremely" deferential to a trial court's sentencing decision, we still must give due consideration to that decision. *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind.Ct.App. 2007). We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* "Additionally, a defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate." *Id.*

■ The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind.2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or

length of the sentence on any individual count." *Id.* Additionally, when reviewing the appropriateness of a sentence under Rule 7(B), we may consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended. *Davidson v. State,* 926 N.E.2d 1023, 1025 (Ind.2010).

Kennedy's aggregate twenty-seven-year sentence is three years less than the advisory sentence for a Class A felony, which is thirty years. *See* Ind.Code § 35–50–2–4. Additionally, with three years of the sentence being suspended, Kennedy will be serving four years more in prison than the minimum twenty-year sentence for a Class A felony. We also observe that the trial court here could not have suspended any part of Kennedy's sentence for Class A felony robbery resulting in serious bodily injury below twenty years, pursuant to statute. *See* I.C. § 35–50–2–2(b)(4)(I). In other words, Kennedy had to receive a sentence requiring at least twenty years of incarceration. Thus, Kennedy has in practical terms been given a sentence approaching the minimum possible that could have been imposed. By contrast, the maximum sentence that could have been imposed here was 100 years.

First turning to the nature of the offense here, we find it to be extremely troubling. Kennedy and Willis, acting on what appears to have been a whim, decided to rob a random individual they saw walking down the street. To accomplish the robbery, Kennedy struck Augustin in the face with a piece of asphalt with sufficient force to fracture his skull. Kennedy then left Augustin while he was bleeding profusely from the head. There is certainly nothing about this robbery that makes it less severe in any way than a "typical" Class A felony robbery.

Regarding Kennedy's character, we find nothing to warrant reduction of his sentence. It is true that Kennedy has no adult criminal history and no juvenile delinquency adjudications, and such a lack of criminal history can be significantly mitigating. *See Merlington v. State,* 814 N.E.2d 269, 273 (Ind.2004). Kennedy's age at the time of the offense—sixteen—also could be considered mitigating, especially combined with the lack of criminal history. *See id.* Nonetheless, we cannot say these factors are so weighty, in comparison to the violent act Kennedy committed, as to make the trial court's already-mitigated sentence inappropriate.

Kennedy devotes most of his time arguing that his sentence is inappropriate in comparison to the fifteen-year sentence with five years suspended that his cohort Willis received. Kennedy relies upon *Cardwell.* There, two defendants, Cardwell and Gentry, were charged with various crimes related to a child who was injured while in their care. Eventually, after a jury trial, Cardwell was convicted of two counts of Class B felony neglect of a dependent and was sentenced to consecutive seventeen-year terms, thus totaling thirty-four years. Gentry, by contrast, was convicted by a jury of only one count of Class D felony neglect of a dependent and received a sentence of eighteen months.

On appeal, our supreme court held that, although it was not required to compare Cardwell's sentence to Gentry's, it concluded that the disparity in their sentences was "stark," particularly in light of its determination that Cardwell's culpability was substantially the same or even less than Gentry's. *Cardwell,* 895 N.E.2d at 1226. In light of this disparity, and other factors noted by the court, it revised Cardwell's sentence to an aggregate term of seventeen years. *Id.*

We observe that in *Cardwell* Cardwell's original sentence was nearly twenty-three times greater than Gentry's, and the revised sentence still was approximately eleven times greater. Here, by contrast, Kennedy's total sentence is less than twice Willis's, while his executed sentence is a little more than twice Willis's sentence. This disparity is not nearly as "stark" as was the case in *Cardwell* Much of that disparity is attributable to the inescapable fact that Willis pled guilty to a Class B felony, with a sentencing range of six to twenty years, while Kennedy went to trial and was convicted of two Class A felonies, each with a sentencing range of twenty to fifty years. *See* I.C. §§ 35–50–2–4 & 35–50–2–5. Furthermore, unlike in *Cardwell* there is evidence that Kennedy was the more culpable party. Although Willis was not an innocent bystander in the robbery, it was Kennedy, not Willis, who caused the serious bodily injury to Augustin by fracturing his skull with a piece of asphalt. In sum, we find nothing in the record to suggest that Kennedy's sentence is inappropriate, either on its own merits or in comparison to Willis's sentence.

### Conclusion

The trial court did not abuse its discretion either in admitting the results of Keeling's DNA testing into evidence or in allowing the late-discovered witness Felty to testify. Additionally, Kennedy's twenty-seven-year sentence is not inappropriate. We affirm Kennedy's convictions and sentence.

Affirmed.

FRIEDLANDER, J., and CRONE, J., concur.