Pursuant to Ind. Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before any
court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the case.

ATTORNEYS FOR APPELLANT:

**CYNTHIA P. HELFRICH**
Helfrich Law Offices
Brownsburg, Indiana

**REBECCA M. EIMERMAN**
Eimerman Law
Zionsville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana



FILED
Apr 10 2013, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DEMETRIUS DAMON TAYLOR, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 32A01-1205-CR-230 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable Robert W. Freese, Judge
Cause No. 32D01-1109-FA-16

**April 10, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Demetrius Damon Taylor ("Taylor") appeals from his convictions of one count of rape[1] as a Class A felony, one count of criminal confinement enhanced because of the use of a firearm[2] as a Class B felony, one count of criminal recklessness[3] as a Class D felony, one count of robbery[4] as a Class B felony, two counts of theft,[5] each as a Class D felony, one count of burglary[6] as a Class A felony, and an habitual offender determination. Taylor presents the following restated issues for our review:

I. Whether Taylor's retrial following a mistrial violated double jeopardy principles;

II. Whether the trial court abused its discretion by admitting DNA population statistical evidence over Taylor's hearsay and confrontation clause objections;

III. Whether the trial court abused its discretion by permitting the victim to give an in-court identification of Taylor; and

IV. Whether the trial court abused its discretion by denying Taylor's motion for mistrial based on prosecutorial misconduct during the habitual offender phase of his trial.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On the afternoon of July 19, 2011, M.W., who was home alone, decided to cool herself off in a kiddy pool, which she had in her back yard for her grandchildren. While

---

[1] *See* Ind. Code § 35-42-4-1.

[2] *See* Ind. Code § 35-42-3-3(b)(2)(A).

[3] *See* Ind. Code § 35-42-2-2(c)(2)(A).

[4] *See* Ind. Code § 35-42-5-1.

[5] *See* Ind. Code § 35-43-4-2.

[6] *See* Ind. Code § 35-43-2-1(2).

she was lying on her stomach on a raft in the pool, someone suddenly pushed her head under the water. When M.W.'s head emerged from the water, she saw an African-American male with facial hair and who was wearing glasses. The man ordered her not to look at him again or he would shoot her, and M.W. felt a gun pressed against the side of her head. The man removed M.W.'s wedding band and ring from her finger. He then walked her toward and into her garage and asked her who else was at home. M.W. replied that her husband was home, even though no one was present, because she hoped that it would scare the man off.

The man forced M.W. inside her house and did so while keeping the gun pressed to M.W.'s head. When the man asked her where her husband was, M.W. admitted that she had lied. The man then demanded money, jewelry, guns, and coins, and told her that if she lied again he would kill her. As the man looked through the house for valuables, M.W. complied with the man's repeated orders not to look at him. The man directed M.W. to provide him with garbage bags, and he also removed her bathing suit top.

The man then forced M.W. upstairs where he made her drop her jewelry into a garbage bag. He then ordered M.W. to bend over her bed, and he removed her bathing suit bottom. The man made a comment about M.W.'s breasts and then inquired if she and her husband had sex, including oral sex. The man then inserted his penis into M.W.'s vagina and had sex with her until he ejaculated inside her. The man then forced M.W. to go into the bathroom and urinate, and then ordered her to shower and clean herself off. While M.W. was doing as she was instructed, the man cleaned himself off at the bathroom sink. The man then ordered M.W. to lie on her bed, face down, and he

3

proceeded to tie her up. The man told her not to move when he retrieved the items he was taking from M.W.'s home. When M.W. no longer heard the man moving around inside her house, she managed to untie herself. She then wiped herself off because she had blood in her vagina and hurriedly dressed. She noticed that her boyfriend's guns were missing, ran down the stairs, locked the door in the garage, and called 911.

Several police officers arrived at M.W.'s house and obtained a brief description of what had happened from M.W. before she was transported by ambulance to the hospital. After arriving at the hospital, M.W. was examined by Carmen Drury ("Drury"), a sexual assault nurse examiner. Drury took specimens from M.W. to prepare a rape kit. The rape kit was turned over to Detective Amanda Keesling ("Det. Keesling"), who questioned M.W. about the attack. Eventually, DNA evidence obtained from the rape kit resulted in a match with Taylor.

Police officers obtained a search warrant for both Taylor and his residence. The search warrant was executed on September 1, 2011, at which time Taylor was arrested, his cell phone was confiscated, and the officers collected Taylor's DNA. Officers also seized jewelry from Taylor's residence. Some of the jewelry seized was later identified by M.W. as some of the jewelry taken from her home by Taylor.

Det. Keesling conducted a photo array identification procedure with M.W., but M.W. was unable to make a positive identification, and in fact, made a tentative identification of another man. Det. Keesling informed M.W. that the man who had attacked her had been captured and that there was DNA evidence matching the person in custody. Further DNA testing demonstrated that Taylor was the source of the DNA

4

acquired from evidence obtained from M.W. and her home following the rape. Taylor's cell phone records also placed Taylor in the area of M.W.'s home near the time of the crime.

The State filed charges against Taylor on September 1, 2011, and his jury trial began on February 7, 2012. On February 13, 2012, during Det. Keesling's testimony, the prosecutor asked her about her knowledge of Taylor's social security number. Taylor objected on hearsay grounds, to which the State then asked questions in an attempt to lay a foundation for the testimony. During this testimony, Det. Keesling stated that the source of her knowledge of Taylor's social security number came from Taylor's BMV record and his criminal history. Taylor objected and requested a mistrial, which the trial court granted.

Prior to Taylor's retrial on the same charges, his counsel filed a motion to dismiss the case, citing double jeopardy issues. The State responded to the motion, and the trial court subsequently denied it. The State dismissed a count alleging Class C felony intimidation against Taylor during the retrial. Also during the retrial, M.W. testified about her unsuccessful attempt to identify the perpetrator from the photo array, but made an in-court identification of Taylor as the perpetrator, which was done without objection. During the testimony of Nicole Keeling ("Keeling"), the forensic biologist, Taylor objected to testimony concerning population probability statistics for DNA matches. The trial court overruled Taylor's objection.

The jury found Taylor guilty of the charges, and the matter proceeded to the handgun enhancement phase of the trial. The jury found Taylor guilty on that count. The

jury was next asked to consider the count alleging that Taylor was guilty of being a serious violent felon in possession of a firearm. The jury found Taylor guilty of that count as well.

During the habitual offender enhancement stage of the trial, Taylor objected on hearsay grounds to the prosecutor reading from the charging documents used for the habitual offender enhancement charge. After Taylor's counsel completed the argument on the objection, the trial court sustained the objection. The deputy prosecutor resumed her argument, and Taylor's counsel objected and argued that the deputy prosecutor was inappropriately arguing sentencing to the jury. Taylor requested a mistrial. The deputy prosecutor responded that her argument was merely rebuttal to Taylor's prior argument, which essentially called for jury nullification. The trial court admonished the jury that it had been instructed not to consider sentencing because that was the trial court's duty. The trial court then allowed the State to continue with its argument, denying Taylor's mistrial motion. The jury found that Taylor was an habitual offender.

On April 20, 2012, the trial court issued its order, which, including consecutive and concurrent sentences, and with an habitual offender enhancement, resulted in an aggregate sentence of one hundred years executed. Taylor now appeals.

## DISCUSSION AND DECISION

### I. Retrial and Double Jeopardy Concerns

Taylor argues that his retrial violated double jeopardy principles. In particular, Taylor argues that during the first trial on these charges, the State solicited improper testimony from one of its witnesses such that Taylor was goaded into moving for a

mistrial. During Det. Keesling's testimony in the first trial, the State asked her for Taylor's social security number. Taylor lodged a hearsay objection which was granted. The State then attempted to establish a non-hearsay foundation for the same evidence. Det. Keesling testified that she gained the information from Taylor's BMV records. The State asked if there was any other source of information for that number. Det. Keesling testified that she obtained it from Taylor's criminal history.

Taylor objected to that testimony and requested a sidebar conference. After the jury was excused, Taylor argued in support of a motion for mistrial that the State had solicited inadmissible evidence of Taylor's criminal history. At the conclusion of that hearing, and out of the presence of the jury, the trial court granted the motion for mistrial and scheduled a retrial on the charges. Taylor requested the opportunity to object to a retrial and submit legal authority in support of that objection.

On March 9, 2012, Taylor submitted a motion to dismiss and a brief in support of the motion. The State filed an answer to the motion to dismiss, after which the trial court denied the motion without a hearing. Taylor argues that the trial court erred by denying the motion.

We quote from our Supreme Court's opinion in *Brock v. State*, 955 N.E.2d 195, 199-200 (Ind. 2011), which states the following about this issue:

> The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *Benton v. Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). As a threshold matter, Brock was protected from being twice placed in jeopardy because jeopardy "attached"

7

when the first jury was impaneled and sworn. *See Downum v. United States*, 372 U.S. 734, 736-37, 83 S. Ct. 1033, 10 L. Ed. 2d 100 (1963); *Jackson v. State*, 925 N.E.2d 369, 373 (Ind. 2010). But this merely "begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause" barred his second trial. *Illinois v. Somerville*, 410 U.S. 458, 467, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1973).

The constitutional protection against double jeopardy has several features. In this case, because the first trial ended in a mistrial, we deal with the defendant's "valued right to have his trial completed by a particular tribunal," *Wade v. Hunter*, 336 U.S. 684, 689, 69 S. Ct. 834, 93 L. Ed. 974 (1949), which means that the defendant has a right to have his trial completed by the first jury impaneled to try him, *Oregon v. Kennedy*, 456 U.S. 667, 673, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982). Valued though this right may be, it "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade*, 336 U.S. at 689, 69 S. Ct. 834; *see also United States v. Jorn*, 400 U.S. 470, 483-84, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971) (plurality opinion). Accordingly, unlike a trial that has ended with a judgment on the merits, declaration of a mistrial does not automatically bar retrial. *Arizona v. Washington*, 434 U.S. 497, 505, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978).

If the trial judge declares a mistrial over the defendant's objection, the defendant may be retried only if the government demonstrates that the mistrial was justified by a "manifest necessity" or that "the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L. Ed. 165 (1824) (Story, J.); *see also Washington*, 434 U.S. at 505, 98 S. Ct. 824; *Somerville*, 410 U.S. at 461-63, 93 S. Ct. 1066. But if the defendant consents to the mistrial, then retrial is permitted as a matter of course, unless the defendant can prove that the government intentionally goaded him or her into consenting to the mistrial "to subvert the protections afforded by the Double Jeopardy Clause." *Kennedy*, 456 U.S. at 676, 102 S. Ct. 2083; *see also Jorn*, 400 U.S. at 485, 91 S. Ct. 547. Thus, determining whether the State was permitted to retry Brock after his first trial ended in a mistrial involves a multi-step analysis. We first consider whether he consented to the trial judge's declaration of a mistrial. If so, then we consider whether the government goaded him into consenting. If he did not consent to the mistrial, then we consider whether it was justified by a "manifest necessity."

A defendant consents to a mistrial where he or she successfully requests termination of the proceedings on grounds unrelated to guilt or innocence. See *United States v. Dinitz*, 424 U.S. 600, 607-12, 96 S. Ct. 1075, 47 L. Ed.

8

2d 267 (1976); *Jorn*, 400 U.S. at 484-85, 91 S. Ct. 547; *United States v. Tateo*, 377 U.S. 463, 467, 84 S. Ct. 1587, 12 L. Ed. 2d 448 (1964); *see also United States v. Scott*, 437 U.S. 82, 98 S. Ct. 2187, 57 L. Ed. 2d 65 (1978) (government appeal from trial court's grant at the close of evidence of defendant's motion to dismiss two counts of indictment did not bar retrial because it was not related to guilt or innocence); *Lee v. United States*, 432 U.S. 23, 97 S. Ct. 2141, 53 L. Ed. 2d 80 (1977) (retrial not barred where defendant successfully moved to dismiss a defective indictment after jeopardy had attached because it was functionally indistinguishable from a mistrial). A defendant may also consent by expressly agreeing to be tried again. *See Ricketts v. Adamson*, 483 U.S. 1, 9-12, 107 S. Ct. 2680, 97 L. Ed. 2d 1 (1987) (retrial not barred where defendant breached plea agreement that provided for reinstatement of charges in the event of a breach).

(internal footnote omitted).

Further, although Taylor cites to article 1, section 14 of the Indiana Constitution, the provision which is Indiana's state constitutional double jeopardy prohibition, and to Indiana Code section 35-41-4-3, Indiana's legislative codification of the prohibition against placing a defendant in jeopardy twice for the same offense, Taylor has not made a specific, separate argument on these grounds. The State argues that Taylor has waived the state constitutional aspect of his argument, citing to *Jackson v. State*, 925 N.E.2d 369, 372 n.1 (Ind. 2010) (waiver where cases cited are federal cases or state cases interpreting federal law).

In this case, the record shows in pertinent part the following questioning by the State of Det. Keesling and exchange with the defense that precipitated Taylor's motion for a mistrial:

> Q: I just have, thank you, detective, I just have three housekeeping matters. Two housekeeping matters . . . what is Mr. Taylor's date of birth?
> A: March 8th of 1975.

9

Q: When I say, Mr. Taylor, I was referring to the defendant.
A: Demetrius Taylor, yes.
Q: And do you know his social security number?
A: I do.
[DEFENSE]: Objection, your honor.
THE COURT: What's your objection?
[DEFENSE]: The witness doesn't have any personal knowledge of this information. It's hearsay.
THE COURT: Response to hearsay objection?
[STATE]: It's a statement by the parties, strike that, may I ask another question in response?
THE COURT: Sure.
Q: And what is your source of information for Mr. Taylor's social security number?
A: His driving record.
Q: And where did you get that driving record?
A: From the BMV, the database.
Q: Okay and did you, any other source of information on that?
A: Yes.
Q: What was that?
A: Criminal history.
Q: Okay . . .
[DEFENSE]: Judge, I'm going to object and ask for a sidebar. . . .[Jurors admonished and moved to jury room].

. . . .

THE COURT: You may be seated. We're back on the record still outside the presence of the jury on FA-16. Mr. Bailiff, raise your right hand, please. Do you swear or affirm under the penalties for perjury the testimony you'll give in this case today, will be the truth?
A: I do.
THE COURT: Thanks, be seated and state your name for the record.
A: Scott Taillon, T-A-I-L-L-O-N.
THE COURT: And Bailiff Taillon, as you were escorting the folks from the jury to the jury room, did any of them make a comment?
A: Yes.
Q: What comment was that?
A: They're trying awfully hard to keep the criminal history out of the case.

10

*Tr.* at 858-64.

The trial court then granted Taylor's request for a mistrial and, after discharging the jurors, discussed scheduling Taylor's retrial. Taylor's counsel requested the opportunity to research whether a retrial of the charges against him was barred. The trial court then stated the following:

> THE COURT: . . . I don't know if the State needs to make a further record, but the question that was asked that drew the answer, I will not find and I don't think I can find that that was done with any malicious intent, whatsoever.
>
> [DEFENSE] I agree, judge, I agree.
>
> THE COURT: It was an inadvertent response from the witness and if I were to presume something based on the law and to make it a non-hearsay answer as to whether-how she found the social security number, I was presuming her response was going to be, the defendant told me his social security number. And had I known it was going to be anything but that, I would have tried to shut the testimony off at that point. But that being the case, we've got a little over a month before the trial so get your research done with regards and one, too, I don't think there was anything that came out of that witnesses[sic] mouth that was malicious or intentional. I think it just happened. But it was something that's caused the trial to be discontinued. And as a I said before, I don't think there's anyway [sic] to have given any type of curative instructions to the jurors on that issue. . . .

*Id*. at 865-66.

We agree with the trial court's finding that the prosecutor did not have the subjective intent to force Taylor into moving for a mistrial. Instead, in attempting to establish a non-hearsay basis for Det. Keesling's personal knowledge of Taylor's social security number, the State asked a question that elicited an inadvertent response leading

11

to a mistrial. The State did not solicit the response, and it was reasonable for the State to have expected Det. Keesling to respond that Taylor told her the information. We agree with and are persuaded by the trial court's finding regarding the State's subjective intent and conclude that Taylor's retrial was not barred under either federal or state double jeopardy principles. *See Wilson v. State*, 697 N.E.2d 466, 473 (Ind. 1998) (trial court's finding on prosecutor's subjective intent regarding conduct leading to mistrial is persuasive, although not conclusive, on appellate review).

## II. DNA Population Statistical Evidence

Taylor contends that the trial court abused its discretion by admitting DNA population statistical probability evidence, offered by way of exhibits, and the testimony of Keeling, a forensic biologist for the Indiana State Police Laboratory. Taylor objected on hearsay grounds, that Keeling was not an expert witness as to the evidence, and on Sixth Amendment confrontation clause grounds.

A trial court has broad discretion in ruling on the admissibility of evidence, and on review, we will disturb its ruling only on a showing of abuse of that broad discretion. *Sparkman v. State*, 722 N.E.2d 1259, 1262 (Ind. Ct. App. 2000). When reviewing a decision under this abuse of discretion standard, we will affirm the trial court's decision if there is any evidence supporting the decision. *Id.* A claim of error in the admission or exclusion of evidence will not prevail on appeal unless a substantial right of the party is affected. Ind. Evidence Rule 103(a). In determining whether error in the introduction of evidence affected a defendant's substantial rights, we assess the probable impact of the evidence on the jury. *Sparkman*, 722 N.E.2d at 1262. In addition, any error in the

12

admission of evidence is harmless, if there is substantial independent evidence upon which the jury could have convicted the defendant. *Dixon v. State*, 967 N.E.2d 1090, 1094 (Ind. Ct. App. 2012).

To be admissible at trial, the proffered evidence must be relevant, that is, it must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. Evidence that is not relevant must be excluded. Evid. R. 402. The admission of expert testimony about DNA evidence is governed by Evidence Rule 702, which provides as follows:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Furthermore, we have held that DNA evidence is admissible if statistical data accompanies that evidence. *Deloney v. State*, 938 N.E.2d 724, 729 (Ind. Ct. App. 2010). Indiana Code section 35-37-4-13(b) provides in pertinent part that in a "criminal trial or hearing, the results of forensic DNA analysis are admissible in evidence without antecedent expert testimony that forensic DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material."

The Polymerase Chain Reaction ("PCR") method, which was the method used for testing the DNA evidence in this case, has been held to be based on proper and reliable

13

scientific principles, the results of which are admissible at trial. *See Ingram v. State*, 699 N.E.2d 261, 263 (Ind. 1998) (PCR analysis for DNA testing accepted in scientific community and foundation for admissibility at trial is laid). Population statistical analysis for DNA evidence has been found to have a valid and reliable scientific foundation. *Patterson v. State*, 742 N.E.2d 4, 12 (Ind. Ct. App. 2000).

In the present case, Keeling, a forensic biologist for the Indiana State Police Laboratory, who holds a bachelor of science degree in chemistry and minors in biology and psychology, from Valparaiso University, where she graduated *cum laude*, presented the testimony about the DNA statistical evidence. Keeling had completed the internship training program for serology and DNA analysis from the Indiana State Police Laboratory ("the Lab"), and had worked in the Lab as a forensic scientist since January 3, 2005. Keeling testified that she obtained the statistics by using a computer program and by performing the calculation by hand herself. She did admit that she was not a statistics expert, but stated that she obtained statistics by using certain accepted numbers based upon the DNA analysis she performs into a mathematical formula.

Taylor concedes that Keeling is an expert in the field of DNA analysis, and has been found to be an expert in the field of DNA forensic analysis in prior appeals. *See Kennedy v. State*, 934 N.E.2d 779, 785-87 (Ind. Ct. App. 2010) (defendant conceded Keeling possessed requisite skill, training, and experience as expert in DNA forensic analysis). Furthermore, the Lab is an accredited DNA lab. *Id*. at 786. Keeling testified that she was current in her training. "Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in

the field." Evid. R. 703. Evidence that would be inadmissible as hearsay may be testified about as the basis for expert opinion if it is of the type reasonably relied upon by experts in the field. *See Pendergrass v. State*, 913 N.E.2d 703, 708-09 (Ind. 2009) ("One general rule about opinions by qualified experts is that they may rely on information supplied by other persons who have supplied material which the expert regards as material, even if the supplier is not present to testify in court.").

The trial court did not abuse its discretion by admitting DNA population statistics that were the opinion of a qualified expert in the field of DNA analysis and which were based on scientific materials generally relied upon by experts in the field of DNA analysis. The fact that the material itself would be inadmissible hearsay does not bar the admission of the opinion evidence. Rather, Keeling's and any other expert witness's testimony about the understanding of the statistical formula and computer program are pertinent to the weight given to the evidence, not its admissibility. The trial court correctly overruled Taylor's objection on hearsay grounds.

Taylor further contends that he was denied his Sixth Amendment right of confrontation when the State was allowed to introduce the DNA population statistics and that Taylor's DNA was not excluded as the donor of the DNA collected from the crime scene and M.W. Taylor argues that, because Keeling is not an expert in the field of population statistics and relied upon computer programs and a mathematical formula developed by another to calculate the probabilities about which she testified at trial, the State was required to produce those other geneticist and statistical experts at trial.

Keeling testified that she calculated the DNA population statistics for the present case by using a computer program and her own hand calculations derived from a mathematical formula. In addition, Keeling testified that the calculations were based upon numbers that have been calculated by the FBI laboratory and that are accepted in the scientific community. She admitted that she was not an expert in the field of mathematical statistics, but that she understood how to complete the calculations by plugging in the numbers to an accepted formula. She testified about her academic credentials, which have been referenced above, and about her laboratory experience. She also stated that the Lab is a fully accredited DNA lab. Although Keeling's qualifications as an expert in DNA analysis are not seriously in dispute, it appears that Taylor argues that the State should have been required to present the testimony of the mathematicians and geneticists who developed the formula and computer program used widely by accredited labs in order to satisfy Taylor's right of confrontation.

The Confrontation Clause prohibits the use of testimonial statements of witnesses who are absent from trial. U.S. Const. amend. VI. The issue of what constitutes "testimonial" statements remains unsettled. *Pendergrass*, 913 N.E.2d at 705-07. That said, our Supreme Court has held that in order to admit laboratory analysis results, it is not necessary for the State to call as witnesses "everyone who laid hands on the evidence." *Id*. at 707 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009)). Furthermore, our United States Supreme Court has held that "the use at trial of a DNA report prepared by a modern, accredited laboratory 'bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.'" *Williams v.*

16

*Illinois*, __ U.S. ___, 132 S. Ct. 2221, 2244, 183 L. E. 2d 89 (2012) (quoting *Michigan v. Bryant*, 562 U.S. __, 131 S. Ct. 1143, 1167 (2011) (Thomas, J. concurring)).

Taylor cross-examined Keeling about her statistical analysis, including how those statistics were calculated and that the calculations were based on a formula devised by other mathematicians and geneticists that are accepted by the scientific community. Keeling's testimony made clear that the formula and computer program she used were generally relied upon by her and other DNA analysis experts. The scientific formula for making the DNA population calculations was not targeted to any individual, but was a general formala used by DNA experts in the multitude of cases with which they are presented. The Confrontation Clause was adopted to combat the use of out-of-court statements for the primary purpose of accusing a targeted individual accused of engaging in criminal conduct. *Williams*, 132 S. Ct. at 2242. Thus, because the population statistics formula was not a statement targeting a specific individual, it did not fall within the definition of "testimonial" for Sixth Amendment purposes.

Keeling's use of the formula and computer program did not violate Taylor's right of confrontation. She did not testify about details of the formula or the computer program. Instead, she acknowledged she was not a statistician and declined to answer questions posed to her about the formula because it was beyond her area of expertise. The trial court did not abuse its discretion by admitting the DNA population statistical evidence.

### III. In-Court Identification

Taylor argues that the trial court abused its discretion by allowing M.W.'s in-court identification testimony. Taylor claims that M.W. had no basis independent of a purportedly unduly suggestive show-up identification procedure from which to base her in-court identification of Taylor.

The admission or exclusion of evidence falls within the sound discretion of the trial court, and its determination regarding the admissibility of evidence is reviewed on appeal only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Doolin v. State*, 970 N.E.2d 785, 787 (Ind. Ct. App. 2012).

The Fourteenth Amendment's guarantee of due process of law requires the suppression of evidence when the procedure used during a pretrial identification is impermissibly suggestive. *Harris v. State*, 716 N.E.2d 406, 410 (Ind. 1999). Nevertheless, a contemporaneous objection is required to preserve an issue regardless of whether the defendant filed a pretrial motion to suppress. *Jackson v. State*, 735 N.E.2d 1146, 1152 (Ind. 2000). Failure to make such an objection waives any claim on appeal that the evidence was improperly admitted. *Brown v. State*, 783 N.E.2d 1121, 1126 (Ind. 2003). More particularly, "[t]o preserve an error for review on appeal, the specific objection relied upon on appeal must have been stated in the trial court as a basis for the objection." *Mitchell v. State*, 690 N.E.2d 1200, 1205 (Ind. Ct. App. 1998). The purpose

of this rule is to give the trial court the opportunity to evaluate the objection under the basis relied upon. *Id.* at 1206.

Prior to Taylor's first trial, his counsel filed a motion in limine seeking to prevent M.W.'s in-court identification of Taylor. The trial court held a hearing on the matter at which M.W. testified that all she remembered from the incident was seeing that her attacker wore glasses, had facial hair, and was African-American. She further testified that she tentatively identified another individual from the photo arrays that were shown to her, claiming that the sole reason she tentatively identified the individual was because he was the only one who was African-American, had facial hair, and wore glasses. During M.W.'s 911 call, she described her attacker as an African-American male.

M.W. further testified that a law enforcement officer told her that an individual had been arrested whose DNA matched the DNA left by her attacker. She stated that when she attended the bond hearing, at which time she had the opportunity to see the side of Taylor's face and hear his voice, she believed that the police officers had correctly arrested her attacker. She claimed that when she heard Taylor speak at his bond hearing, she recognized his voice as that of her attacker. The trial court denied Taylor's motion in limine.

Taylor objected to M.W.'s identification testimony during the first jury trial, and that objection was overruled. During Taylor's retrial, he failed to object to M.W.'s in-court identification testimony. Taylor claims that the objection and ruling on this issue from his first trial were incorporated by reference in his retrial and supports that argument with a citation to the record. A review of that portion of the record, however, reveals that

19

the trial court incorporated the proposed instructions, objections thereto, and rulings made in the first trial as to those proposed instructions.

Thus, the record from the second trial reflects that Taylor failed to object to this testimony during his retrial, and the issue has been waived for appeal. Taylor acknowledges that the citation to the record pertains to the incorporation of proposed instructions, objections, and rulings from his first trial, but argues that this demonstrates the agreement of the parties to incorporate all objections, rulings, foundation, and chain of custody from the first trial in the retrial. His claim of fundamental error appears for the first time in Taylor's reply brief. An appellant cannot raise an argument for the first time in his reply brief. *Gray v. State*, 593 N.E.2d 1188, 1191 (Ind. 1992).

Waiver notwithstanding, the trial court did not abuse its discretion by allowing M.W.'s identification testimony. We have stated the following about one-on-one show-up procedures:

> The United States Supreme Court and the Indiana Supreme Court have both condemned the practice of conducting a one-on-one show-up because of its inherent suggestiveness. *Wethington v. State*, 560 N.E.2d 496, 501 (Ind. 1990). In *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), the United States Supreme Court held that a show-up confrontation between a criminal defendant and a witness may deny a defendant due process of law under the Fourteenth Amendment. 388 U.S. at 301-02, 87 S. Ct. at 1972-73. Nonetheless, identification evidence gathered via a show-up procedure is not subject to a per se rule of exclusion. *Wethington*, 560 N.E.2d at 501. "Rather, the admissibility of the evidence turns on an evaluation of whether, under the totality of the circumstances, the confrontation was conducted 'in such a fashion as to lead the witness to make a mistaken identification.'" *Id.* (quoting *Dillard v. State*, 257 Ind. 282, 274 N.E.2d 387, 389 (1971)).

*Mitchell v. State*, 690 N.E.2d 1200, 1203-04 (Ind. Ct. App. 1998).

20

Indiana Constitution article 1, section 13(b) confers upon M.W. the right to attend Taylor's bond hearing. M.W.'s presence at the hearing was not instigated by law enforcement officers. As such, her viewing of Taylor at the bond hearing was not orchestrated by the police officers involved in the investigation. "A 'show-up' presupposes an out-of-court confrontation conducted by police for the purpose of allowing a witness to identify a suspect." *Flowers v. State*, 738 N.E.2d 1051, 1056 (Ind. 2000) (citing *Wethington*, 560 N.E.2d at501). Therefore, M.W.'s viewing of Taylor at the bond hearing was not a show-up identification procedure.

Presuming, although not concluding, that M.W.'s in-court identification testimony was improper, the State produced ample probative evidence linking Taylor to the crimes charged. The DNA evidence strongly connected Taylor to the crimes, and fingerprint evidence linked him to the crime scene. Cell phone records linked Taylor to the area of the crime at the time of the crimes. Jewelry found in Taylor's possession was identified by M.W. at trial as part of her jewelry which was taken during the crime. Thus, given the strength of the additional evidence linking Taylor to the crimes, any error in the admission of M.W.'s in-court identification was harmless. We find no reversible error here.

### IV. Prosecutorial Misconduct During Habitual Offender Phase

Taylor claims that the deputy prosecutor committed prosecutorial misconduct during the habitual offender phase of Taylor's trial. More particularly, Taylor claims that the deputy prosecutor inappropriately made sentencing arguments to the jury and read

hearsay statements to the jury after the trial court had excluded the statements from evidence.

During the habitual offender phase of the proceedings, the deputy prosecutor began reading from the charging documents used in the habitual offender enhancement charge. Taylor objected on hearsay grounds, and the trial court sustained the objection. No mistrial motion was made at the time, nor was there a request for an admonishment. Shortly after the deputy prosecutor resumed her argument, Taylor objected to the State arguing sentencing to the jury and requested a mistrial. The deputy prosecutor replied that her argument was in response to Taylor's prior argument which appeared to be a request for jury nullification. The trial court admonished the jury that it had been instructed not to consider sentencing because that was the trial court's duty. The trial court denied the motion for mistrial and allowed the State to continue making its argument.

Our Supreme Court stated the following about appellate review of such claims:

We evaluate a properly preserved claim of prosecutorial misconduct using a two-step analysis. We first determine whether misconduct occurred, then, if there was misconduct, we assess "whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected" otherwise. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). To preserve a claim of prosecutorial misconduct, the defendant must ask the trial court, at the time the misconduct occurs, to admonish the jury or move for a mistrial if admonishment is inadequate. *Id*. Failure to request an admonishment or a mistrial waives the claim, unless the defendant can demonstrate that the misconduct rises to the level of fundamental error. *Id*. Fundamental error is a narrow exception intended to place a heavy burden on the defendant. It requires the defendant to establish that the misconduct "[made] a fair trial impossible or constitute[d] clearly blatant violations of basic and elementary principles of due process" or that the misconduct "present[ed]

22

an undeniable and substantial potential for harm." *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002); *accord Cooper*, 854 N.E.2d at 835.

*Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012).

Taylor's hearsay objection to the State's argument was sustained by the trial court. Taylor did not request an admonishment and made no motion for mistrial at that time. Consequently, we need not engage in appellate review of this claim, because it was not properly preserved.

Taylor asserts that the State committed prosecutorial misconduct by arguing sentencing to the jury. During Taylor's opening argument at the habitual offender stage of the proceedings, his counsel argued that although Taylor had a prior criminal history, he has been a good and productive person since his prior crimes. Taylor's counsel noted that Taylor had fathered several children, had a business, paid his bills, and had mentored others. Taylor's counsel then asked the jury to consider all of those things, arguing that the jury alone could find Taylor was a habitual offender, even though he was willing to admit his prior convictions. Taking defense counsel's argument as a request for jury nullification, the State's final argument to the jury was that it would be inappropriate for the jury to find that Taylor was not an habitual offender because he had exhibited good behavior between crimes.

"A party is not subject to traditional limitations in rebuttal argument if the opposing party makes a comment or an argument that justifies a statement in reply that would otherwise be improper." *Barton v. State*, 936 N.E.2d 842, 852 (Ind. 2006) (citing *Cooper*, 854 N.E.2d at836). Applying that rationale here, we conclude that the State did

23

not engage in prosecutorial misconduct. The trial court appropriately chose to admonish the jury in order to clarify any misunderstanding, rather than grant the request for a mistrial. Furthermore, Taylor has failed to establish that he was placed in a position of grave peril or that a fair trial was impossible as a result of those remarks. The evidence established that Taylor was an habitual offender. We find no error here.

Affirmed.

VAIDIK, J., and PYLE, J., concur.