## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

Jan 20 2017, 6:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

David M. Payne
Ryan & Payne
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jerry D. Vest,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 20, 2017

Court of Appeals Case No.
27A02-1512-CR-2171

Appeal from the
Grant Superior Court

The Honorable
Dana J. Kenworthy, Judge

Trial Court Cause No.
27D02-1503-F3-6

**Kirsch, Judge.**

[1] Jerry D. Vest ("Vest") was convicted after a jury trial of aggravated battery,[1] a Level 3 felony, battery[2] as a Level 5 felony, two counts of intimidation,[3] each as a Level 6 felony, and domestic battery[4] as a Class A misdemeanor. He was sentenced to an eight-year aggregate sentence with four and a half years suspended to probation and three and a half years executed. Vest appeals, raising the following restated and consolidated issues:

> I. Whether the trial court abused its discretion when it admitted audio recordings of telephone conversations involving Vest while he was in jail and denied Vest's motion for a continuance of several days in which to listen to the calls;
>
> II. Whether sufficient evidence was presented to support Count III, intimidation;
>
> III. Whether the trial court abused its discretion when it allowed the testimony of a domestic violence expert to be admitted at trial; and
>
> IV. Whether the trial court abused its discretion when it imposed a No Contact Order as part of Vest's sentence.

[2] We affirm.

---

[1] *See* Ind. Code § 35-42-2-1.5.

[2] *See* Ind. Code § 35-42-2-1(b)(1), (f)(2).

[3] *See* Ind. Code § 35-45-2-1(a)(1), (b)(1)(A).

[4] *See* Ind. Code § 35-42-2-1.3(a).

# Facts and Procedural History

Vest is married to S.V., and they have four children together, who were all adults at the time of the incident at issue. On February 27, 2015, in the evening, their daughter, Jackie, and their son, Shawn, and his girlfriend came to Vest's home to celebrate Shawn's twenty-first birthday. Everyone was drinking alcoholic beverages that evening. When she arrived at the house, Jackie noticed that Vest was in a "grumpy, . . . bitter acting mood." *Tr.* at 108. After Vest made several snide remarks to Jackie, Shawn, and S.V., Jackie left the house to go for a walk. While she was gone, Vest and Shawn got into a physical altercation, and Shawn and his girlfriend decided to leave.

About fifteen or twenty minutes after she left the house, Jackie returned. As she approached the house, she could hear loud music playing from inside. When she attempted to open the door, it was locked, so she walked around to the kitchen window and looked inside. Inside the house, Jackie saw Vest hitting S.V. over the head with a bar stool, while S.V. was lying on the kitchen floor. Jackie screamed and knocked on the window, and Vest looked over and saw her. Jackie went back over to the door and knocked again.

Vest asked who was there, and Jackie replied, "It's Kathy," which is the name of a close friend of Vest. *Id.* at 112-13. Vest opened the door and stated, "Kathy, you need to help me clean this mess up." *Id.* at 113. Jackie ran inside the kitchen and grabbed her cell phone. She saw that S.V. appeared "lifeless" and was bleeding significantly from a large cut on the top of her head. *Id.* at

114. Jackie attempted to stop the bleeding with one hand, while she simultaneously called 911. Vest asked Jackie, "Who are you? What are you doing in my house?" *Id*. at 116. He then smacked S.V. as if trying to revive her, and Jackie yelled at him to stop. Vest asked Jackie who she was talking to on the phone, and she stated, "Justin," so that Vest would not know she was calling 911. *Id*. Vest stated to Jackie that "he was going to blow [her] head off." *Id*. at 117.

[6] That night, Fairmount Police Department Officer Dylan McDaniel ("Officer McDaniel") was off duty, but heard a radio dispatch of a domestic disturbance that was within a mile and a half of his location, so he responded at approximately 11:00 p.m. When Officer McDaniel arrived at Vest's home, Jackie came frantically running out of the house, screaming, "My mom's going to die! . . . You've got to help her." *Id*. at 84. Jackie informed Officer McDaniel that her father had tried to kill her mother. Officer McDaniel and another responding officer yelled for Vest to exit the house, and Vest eventually came outside and was handcuffed. Vest had a calm demeanor and expressed no concern for S.V.; he also appeared to be heavily intoxicated. Vest was arrested and transported to the Grant County Jail. While there, a deputy observed blood on Vest's pants, boots, arms, and hands. Vest also had a cut on his knuckles.

[7] Officer McDaniel entered the house and observed S.V. lying face down on the kitchen floor, bleeding from a cut on her face. Other officers also noticed several broken items inside the house when they entered, including a statue, a

ceiling fan, and various pieces of glass. S.V. was initially unresponsive, but eventually regained consciousness and started screaming. Officer McDaniel attempted to calm her down and explained that he was trying to help her and that she needed to go to the hospital. *Id*. at 87-88. S.V. said, "I can't go to the hospital. He tried to kill me." *Id*. at 88. When Officer McDaniel insisted that she needed to go to the hospital due to the severity of her injuries, S.V. responded, "I can't, he will kill me. . . . I can't believe he did this to me." *Id*.

[8] When medical personnel tried to treat her, S.V. was combative and "kept saying that he did this." *Id*. at 98. She also stated that she did not want Vest to go to jail because "[i]f he goes to jail he'll kill me." *Id*. at 52. S.V. was taken by ambulance to the hospital and wanted Jackie to be with her because "she saved [her] life." *Id*. at 67. The police spoke with Jackie, who told them that "this had happened in the past, and she wanted it to stop." *Id*. at 254. The police did not notice any injuries to Jackie, and there were no indications that Jackie was involved in the battery of S.V. During her treatment at the hospital, S.V. told a nurse that her husband had hit her in the head with a bar stool and that "he didn't mean to do it . . . she had made him mad." *Id*. at 369. Jackie stayed with S.V. during the time she was hospitalized and moved in with her when S.V. was released from the hospital.

[9] On March 2, 2015, an investigator with the prosecutor's office spoke with S.V. At that time, S.V. reiterated that it was Vest who had attacked her and stated that she did not want to be around Vest. *Id*. at 189-90. On April 28, 2015, Officer McDaniel responded to a call at the Vest home, in which Jackie was

complaining of S.V. being loud and "out of control with her drinking that night." *Id*. at 133. When Officer McDaniel spoke with S.V., she said that "Jackie wasn't being nice to her" and that "she lost her everything" because her husband was in jail. *Id*. at 200. Officer McDaniel responded that he was present on the night that S.V. was attacked and that "she shouldn't be treated that way." *Id*. S.V. responded, "So what, my husband whooped my ass, I love him, but I'm not going to be treated like garbage by my daughter." *Id*.

[10] On March 2, 2015, the State charged Vest with Count I, Level 3 felony aggravated battery, Count II, Level 5 felony battery, Count III, Level 6 felony intimidation, Count IV, Level 6 felony intimidation, and Count V, Class A misdemeanor domestic battery. A jury trial was held, and S.V. testified that on the evening she was attacked, Vest and Shawn got into a fight and were "beating the holy crap out of each other." *Id*. at 176. She stated that Shawn and his girlfriend left soon thereafter, and Vest followed them. *Id*. S.V. testified that she was upset, and when Jackie returned from her walk, S.V. told her that "[i]f [she] had not []brought all this alcohol here to get drunk, [Vest and Shawn] would not have gotten into a fight." *Id*. at 177. S.V. then stated that Jackie grabbed a glass mug off of the bar and hit S.V. in the head with the mug, which caused S.V. to fall off of her bar stool. *Id*. S.V. testified that Jackie then began beating her while she was on the floor. *Id*. at 178.

[11] Linda Wilk ("Wilk"), the Director of the Hands of Hope program, which focuses on the prevention and intervention of domestic violence, testified at Vest's trial as an expert witness for the State. Vest objected to Wilk's testimony

about the effects of domestic violence on the victim and argued that Wilk did not have any personal knowledge relevant to the case. The trial court overruled Vest's objection.

[12] During the course of the trial, the State learned from a deputy sheriff that recordings of telephone conversations that took place while Vest was in jail between him and his family members had been discovered. *Id.* at 355. Vest objected to the late notice of these recordings and requested a continuance. The trial court ruled that the State could not mention the recordings that day and that Vest could review the evidence overnight before the recordings were admitted. *Id.* at 356. The next day at trial, the recordings were admitted into evidence over Vest's objection. *Id.* at 389-90.

[13] In the recordings, Vest referred to S.V. in code by stating that he was talking about his dog "Tootie." *State's Ex.* 49. During one of the calls, Vest gave an account of his version of what occurred on the night that S.V. was attacked and stated, "Talk to Tootie about this, no one else." *Id.*; *Tr.* at 396. At the conclusion of the trial, the jury found Vest guilty of amended Count I, Level 5 felony battery, Count II, Level 5 felony battery, Count III, Level 6 felony intimidation, Count IV, Level 6 felony intimidation, and Count V, Class A misdemeanor domestic battery. The trial court sentenced Vest to an aggregate sentence of eight years with four and a half years suspended to probation and three and a half years executed. Vest was also ordered to have no contact with S.V. until he completes his incarceration, a mental health evaluation, and a ten-week domestic violence program. Vest now appeals.

# Discussion and Decision

## I. Admission of Recordings

[14] Vest argues that the trial court abused its discretion in allowing the recordings of his phone calls into evidence because the State failed to produce them before trial and that it was an abuse of discretion to not grant Vest a continuance. Trial courts have broad discretion in dealing with discovery violations by the State in the alleged late disclosure of evidence to the defense. *Kennedy v. State*, 934 N.E.2d 779, 784 (Ind. Ct. App. 2010) (citing *Berry v. State,* 715 N.E.2d 864, 866 (Ind. 1999)). We may reverse the manner in which the trial court deals with such an alleged violation only for an abuse of that discretion involving clear error and resulting prejudice. *Id.* Generally, the proper remedy for a discovery violation is a continuance. *Id.* "Exclusion of the evidence at trial is an extreme remedy that is warranted only if the State's actions were deliberate and its conduct prevented a fair trial." *Id.*

[15] Vest asserts that it was an abuse of discretion for the trial court to allow the State to admit State's Exhibit 49, which consisted of two recordings of telephone calls between himself and family members, because the evidence was not disclosed until after the trial had begun and was not provided to the defense in a timely fashion. Vest further argues that the trial court abused its discretion in denying his motion for a continuance to allow an opportunity to listen to all of the calls Vest made while in jail. He contends that the trial court should have allowed him a reasonable opportunity to prepare for this evidence or not allow the evidence to be admitted at all.

[16]    Here, there is no indication in the record that the delay in producing the recordings was the result of deliberate conduct by the State. The record shows that the State was not aware of the recordings until the sheriff's deputy notified the prosecutor, during the trial, that she had listened to the recordings the morning the State sought to admit them. *Tr.* at 355, 362. Additionally, when the trial court overruled Vest's objection, it ruled that the State could not mention the recordings at trial that day and allowed Vest to review the recordings overnight before the exhibit was offered into evidence the next day. *Id*. at 356.

[17]    In *Taylor v. State*, 676 N.E.2d 1044 (Ind. 1997), our Supreme Court held that the trial court did not err in a similar situation. There, the defendant objected to the trial court's decision to allow the State to call a witness who was not on the witness list. *Id*. at 1046. The trial court denied the defendant's motion to strike the witness's testimony, but allowed the defendant the opportunity to interview the witness before cross-examining him. *Id*. There was no evidence in *Taylor* that the State had deliberately avoided telling the defendant about the witness, and the Supreme Court found that the trial court was within its discretion in ruling that the defendant was "entitled to no more than a continuance [, and] . . . the trial court effectively gave [the defendant] that relief by allowing him to interview and cross-examine the witness." *Id*.

[18]    In the present case, the trial court also found no deliberate conduct on the part of the State and effectively provided Vest with his requested relief of a continuance when it ruled the State could not mention the evidence that day

and allowed him to review the recordings overnight before they were admitted the next day at trial. *Tr.* at 355, 356, 362. We, therefore, conclude that the trial court did not abuse its discretion. *See Taylor*, 676 N.E.2d at 1046 (finding no basis for reversal).

## II. Sufficient Evidence

[19] Vest contends that the State failed to present sufficient evidence to support his conviction for Count III, Level 6 felony intimidation. The deferential standard of review for sufficiency claims is well settled. When we review the sufficiency of evidence to support a conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Boggs v. State*, 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied*. We consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn from this evidence. *Fuentes v. State*, 10 N.E.3d 68, 75 (Ind. Ct. App. 2014), *trans. denied*. We also consider conflicting evidence in the light most favorable to the trial court's ruling. *Oster v. State*, 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied*. We will not disturb the jury's verdict if there is substantial evidence of probative value to support it. *Fuentes*, 10 N.E.3d at 75. We will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Lock v. State*, 971 N.E.2d 71, 74 (Ind. 2012). As the reviewing court, we respect "the jury's exclusive province to weigh conflicting evidence." *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005).

[20] Vest claims that the evidence was insufficient to support his intimidation conviction because the evidence presented did not prove beyond a reasonable doubt that he communicated a threat to S.V. or that he intended to place S.V. in fear of retaliation for a prior lawful act or have her engage in conduct against her will. He further asserts that the evidence at trial did not indicate what he was trying to get S.V. to do, if anything, when he made the statement at issue.

[21] In order to convict Vest of intimidation as a Level 6 felony, the State was required to prove beyond a reasonable doubt that he communicated a threat to commit a forcible felony to S.V. with the intent that she engage in conduct against her will or that she be placed in fear of retaliation for a prior lawful act. Ind. Code § 35-45-2-1(a)(1), (b)(1)(A). Specifically, under the charging information, the State was required to prove that Vest communicated a threat to commit a forcible felony to S.V., "to wit: that if he started beating her he would not stop until he killed her." *Appellant's App.* at 17.

[22] The evidence most favorable to the verdict was that during an argument in December 2014, Vest told S.V. "something like" "if he started beating [her,] he would not stop until he killed [her]." *Tr.* at 152. This was sufficient evidence for the jury to conclude that Vest had communicated a threat to commit a forcible felony to S.V. "For purposes of felony intimidation, the specific intent which must coincide with the threat, that the other person engage in conduct against his will, includes an intent that the other person refrain from conduct as well as affirmatively engage in conduct." *Johnson v. State*, 605 N.E.2d 762, 766 n.1 (Ind. Ct. App. 1992), *trans. denied.* In the present case, the evidence was

sufficient for the jury to infer that S.V. understood Vest's threat to mean that she should refrain from engaging in any conduct that would provoke him because if he started to beat her, he would kill her. Vest relies on *Causey v. State*, 45 N.E.3d 1239 (Ind. Ct. App. 2015) for his contention that the evidence was insufficient to support his conviction. However, that case is distinguishable from the present case because, there, the defendant was only charged with communicating a threat with the intent that the victim be placed in fear of retaliation for a prior lawful act and not with acting with the intent that the victim engage in conduct against his or her will. *Id*. at 1241. We conclude that sufficient evidence was presented to support Vest's conviction for Count III, Level 6 felony intimidation.

## III. Admission of Testimony

[23] Vest argues that the trial court abused its discretion when it admitted into evidence the testimony of Wilk, a domestic violence expert.[5] A trial court has broad discretion in ruling on the admissibility of evidence and we will disturb its rulings only where it is shown that the court abused that discretion. *Hoglund v. State*, 962 N.E.2d 1230, 1237 (Ind. 2012). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.* Indiana Evidence Rule 403 states as follows: "Although relevant, evidence may be excluded if its probative value is

---

[5] Vest concedes that Wilk is an expert in the field of domestic violence.

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

[24] Vest contends that it was an abuse of discretion to admit the testimony of Wilk because she had no personal knowledge relevant to the case. He asserts that Wilk's testimony was merely "documenting the horrors of domestic violence" and that she knew nothing about the facts of the case. *Appellant's Br.* at 29. Vest, therefore, alleges that the prejudicial harm of Wilk's testimony outweighed any probative value.

[25] Indiana courts have previously observed that the reactions and behaviors of domestic violence victims are not commonly understood by laypersons. *Otte v. State*, 967 N.E.2d 540, 548 (Ind. Ct. App. 2012) (citing *Odom v. State,* 711 N.E.2d 71, 75 (Ind. Ct. App. 1999), *trans. denied*), *trans. denied.* "Consistent with this view, this court has endorsed the use of expert testimony about domestic abuse/battered woman syndrome to explain witness recantation." *Id.* (citing *Odom*, 711 N.E.2d at 72 n.2, 77 (domestic abuse); *Carnahan v. State,* 681 N.E.2d 1164, 1166-68 (Ind. Ct. App. 1997) (battered woman syndrome)). "[T]estimony regarding a victim's propensity to recant in this context simply provides the jury with information outside its experience, permitting it to assess credibility based upon a more complete understanding of all potential factors at issue." *Id.*

Here, at trial, Wilk, the Director of the Hands of Hope program, which focuses on the prevention and intervention of domestic violence, testified as an expert witness for the State. She testified regarding misconceptions of domestic violence and the effects of domestic violence on the victims. *Tr.* at 222-34. Wilk further testified as to how victims often recant their allegations of domestic abuse or shift the blame of what happened to another person. *Id.* at 229-31. We find that Wilk's testimony had significant probative value by providing the jury with information to "assess credibility based upon a more complete understanding of all potential factors at issue." *See Otte*, 967 N.E.2d at 548. As for the prejudicial effect of the testimony, Wilk testified that she had no personal knowledge of the facts of the present case, and the jury was able to accept or dismiss Wilk's testimony as it applied to the instant case. We, therefore, conclude that the probative value of the evidence was not outweighed by the prejudicial effect, and the trial court did not abuse tis discretion in admitting Wilk's testimony.

## IV. No Contact Order

Vest argues that the trial court abused its discretion in sentencing him when it imposed a No Contact Order. Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Anglemyer v. State,* 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (2007). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

[28]    Vest contends that it was an abuse of discretion for the trial court to impose a No Contact Order as to S.V. as a part of the sentencing order. He claims that there was no evidence of other incidents of domestic violence between the parties prior to the present occurrence and that S.V. wished to have contact with Vest and to have the No Contact Order lifted at sentencing. He asserts it was an abuse of discretion for the trial court to preclude contact between him and S.V. for the period of time that it will take him to finish his executed sentence and meet the requirements ordered by the trial court, when they had already not had direct contact for almost a year while the charges were pending.

[29]    During sentencing, the trial court found the following to be an aggravating factor:

> Evidence was presented during the trial that [Vest] violated the No Contact Order issued in this Cause. He did so through jail calls with family members. [Vest] admits to lying to at least one family member about the offenses during this communication. In the communications, he referred to his wife in code as his "dog." [Vest's] willingness to violate the No Contact Order and to manipulate his family while doing so is a *strong* aggravating factor.

*Appellant's App*. at 10 (emphasis in original). As a part of his sentence, and as a condition of his probation, Vest was ordered to have no contact with S.V. until he completed his executed sentence, a mental health evaluation, and a ten-week domestic violence program. *Id*. at 12. Under Indiana Code section 35-38-1-30, a sentencing court is authorized to order a defendant to have no contact with an individual as a condition of the defendant's sentence.

[30]     Although Vest alleges that there was no evidence that he had previously attacked S.V., there was testimony that Jackie had told Officer McDaniel that "this had happened in the past, and she wanted it to stop." *Tr.* at 254. There was also testimony that Vest had previously threatened that "if he started beating [S.V.], he would not stop until he killed [her.]" *Tr.* at 152. Additionally, the injuries that S.V. suffered as a result of the present domestic abuse were significant, resulting in an injury to her head and unconsciousness and allowed the trial court to infer that Vest was a threat to S.V. Further, as the aggravating factor showed, there was evidence that Vest violated the No Contact Order that was in place during the pendency of the case. In addition to the executed sentence and probation, the trial court ordered Vest to complete a mental health evaluation and a domestic violence program, which will hopefully help Vest to avoid future incidents of domestic abuse, and it was reasonable for the trial court to order no contact with S.V. until these requirements are completed. The trial court did not abuse its discretion in ordering a No Contact Order as part of Vest's sentence.

[31]     Affirmed.

[32]     May, J., and Crone, J., concur.